CIVIL ACTION NO. 2012-264 (WOB)

AMERICAN ATHEISTS, INC.,
ET AL.                                              PLAINTIFFS

VS.                    <u>MEMORANDUM ORDER AND OPINION</u>

DOUGLAS SHULMAN                                     DEFENDANT


This matter is before the Court on the Defendant's motion to dismiss the complaint (Doc. 19).

The Court held oral argument on this motion on Thursday, November 21, 2013. Edwin Kagin was present for the Plaintiffs. Melissa Dickey was present for the Defendant. Official Court Reporter LaCartha Pate recorded the proceedings. Thereafter, the Court took the motion under further advisement. Doc. 26, Minute Entry Order.

Subsequently, the Court was advised that on November 22, 2013, the U.S. District Court for Western District of Wisconsin issued an Opinion and Order on issues relevant to the controversy before the Court, and the Court ordered the parties to brief the applicability of the opinion to the instant case. Doc. 27, Order.

Having reviewed the written filings and heard from the parties, and being sufficiently advised, the Court hereby issues the following memorandum opinion and order.

# I. FACTUAL AND PROCEDURAL HISTORY

Plaintiffs American Atheists, Inc., Atheists of Northern Indiana, Inc., and Atheist Archives of Kentucky, Inc. (collectively, the "Atheists" or "Plaintiffs") seek injunctive and declaratory relief to enjoin the Defendant in his capacity as Commissioner of the Internal Revenue Service ("IRS") from enforcing certain provisions of the Internal Revenue Code ("I.R.C."), which the Atheists assert are preferentially applied to churches and religious organizations. Doc. 1, Complaint, ¶1.

The Atheists assert that "I.R.C. §501(c)(3) distinguishes between entities that are religious in nature, on the one hand, and those that are charitable, scientific, testing for the public safety, literary, educational, or dedicated to amateur athletics or the prevention of cruelty to children or animals, on the other." *Id.* at ¶9. According to Plaintiffs, "'Religious organizations' and 'churches' are treated differently from all other organizations entitled to tax exemptions under I.R.C. §501(c)(3)", and "under the IRS's application of I.R.C. §501(c)(3), churches receive certain preferences that even religious organizations do not." *Id.*

Although the Atheists do not specifically identify the statutes and regulations they attack in their complaint, Defendant's motion to dismiss and the Court's research has established that the following provisions of the I.R.C are those that the Atheists assert are discriminatorily enforced:

1.  <u>Churches are not required to file an application for recognition of tax-exempt status.</u>

In order to receive exemption from federal income tax under I.R.C. §501(c)(3), organizations must file Form 1023. 26 U.S.C. §508(a); 26 C.F.R. §1.508-1. However, churches and any other organization that is not a private foundation and has annual gross receipts less than $5000 are not required to file Form 1023. 26 U.S.C. §508(c)(1). A non-church, religious organization (or any other organization) with annual gross receipts over $5000 is required to file Form 1023. 26 U.S.C. §508(c)(1)(A)-(B).

2.  <u>Churches are not required to file an annual information return.</u>

Generally, I.R.C. §501(c)(3) organizations must file an annual informational tax return on Form 990 or 990-PF.[1] 26 U.S.C. §6033(a)(1); 26 U.S.C. §1.6033-2(a)(2)(i). However, exemptions for the informational return are granted to churches, the religious activities of a religious order, and any organization that is not a private foundation and has annual gross receipts less than $5000. 26 U.S.C. §6033(a)(3)(A).

3.  <u>Ministers of the gospel are able to receive a parsonage allowance.</u>

26 U.S.C. §107(1) excludes the rental value of a home furnished as part the compensation of a "minister of the gospel" from his or her gross income. 26 U.S.C. §107(2) excludes rental allowance paid as part of the compensation

---

[1] Pursuant to 28 U.S.C. §6033(b), an informational tax return shall be filed annually and include the §501(c)(3) organization's (1) gross income for the year; (2) expenses attributable to such income and incurred within the year; (3) disbursements within the year for the purposes for which it is exempt; (4) a balance sheet showing its assets, liabilities, and net worth as of the beginning of such year; (5) the total of the contributions and gifts received by it during the year, and the names and addresses of all substantial contributors; (6) the names and addresses of its foundation managers and highly compensated employees; (7) the compensation and other payments made during the year to each individual described in paragraph six; and other various requirements specific to different types of §501(c)(3) organizations.

of a "minister of the gospel" from his or her gross income.[2]

4. <u>Salaries of ministers of the gospel are exempted from income tax withholding and FICA taxes.</u>

The I.R.C. provides an exception from the income tax withholding requirement and an exemption from the FICA tax for wages paid for services performed by a minister of the gospel in the exercise of his or her ministry. 26 U.S.C. §§1402(c)(4), 1402(e), 3121(b)(8), 3401(a)(9).

5. <u>The IRS is required to follow specific procedures when examining a church.</u>

I.R.C. §7611 requires the IRS to follow specific procedures when conducting a "church tax inquiry" or a "church tax examination." 26 U.S.C. §7611. Generally, a "church tax inquiry" is a determination as to whether that entity meets the qualifications to be exempt from federal income tax. 26 U.S.C. §7611(h). A "church tax examination" is an examination of a church's records or activities. 26 U.S.C. §7611(h)(3).

The IRS may commence a church tax inquiry only if an appropriate high-level Treasury official reasonably believes, on the basis of facts and circumstances recorded in writing, that the church may not be exempt from tax or may be carrying on an unrelated trade or business or otherwise subject to tax. 26 U.S.C. §7611(a)(2). The heightened requirements outlined in §7611 only apply to churches and not religious organizations or other organizations.

The Atheists allege that the IRS's differing treatment of churches and other tax-exempt entities violates the Equal Protection laws of the Fifth Amendment, the First Amendment and the Religious Test Clause of Article VI, §3 of the Constitution. Doc. 1, Complaint, ¶11. The Atheists claim that upon information and belief "a number of atheist organizations have tried to obtain IRS classification as religious organizations or churches under §501(c)(3) or to otherwise

_____

[2] This is often referred to as the parsonage allowance.

obtain equal treatment," and "most of those applications and attempts were rejected by the IRS." *Id.* at ¶¶21-22.

The Atheists claim they "suffer from unconstitutional discrimination and coercion arising from their inability to satisfy the IRS test to gain classification to secure the same treatment as religious organizations or churches under I.R.C. § 501(c)(3)." *Id.* at ¶32. However, the Atheists admit that they have never sought recognition as a religious organization or church under §501(c)(3). *See* Doc. 22, Pl. Response in Opp. to Mot. to Dismiss, pp. 2 n. 1, 4. Rather, the Atheists assert that it would violate their sincerely held believe to seek classification as a religious organization or church from the IRS.

As its form of relief, the Atheists request the Court issue a judgment "[d]eclaring that all Tax Code provisions treating religious organizations and churches differently than other 501(c)(3) entities are unconstitutional violations of the Equal Protection of the Laws required pursuant to the Due Process Clause of the Fifth Amendment, the Religious Test Clause of Art. VI, §3, and the Establishment Clause of the First Amendment of Constitution of the United States of America; [and e]njoining [the IRS] from continuing to allow preferential treatment of religious organizations and churches under §501(c)(3)." *Id.* at pp. 12-13.

## II.   ANALYSIS

### A. Plaintiffs Lack Standing

#### 1. Lack of Injury

The Atheists lack Article III standing to assert their claims. Standing requires that "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984), *arguably abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 134 S.Ct. 1377 (Mar. 25, 2014). The injury for standing purposes must be an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotations omitted). Additionally, "[i]n order to satisfy prudential standing, the [Atheists'] claims must 1) assert their own legal rights and interests, 2) be more than a generalized grievance, and, 3) in statutory cases, fall within the zone of interests regulated by the statute in question." *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 278 (6th Cir. 2009) (citation and internal quotations omitted).

The Atheists argue that as a direct consequence of the IRS's allegedly discriminatory policies, they are injured by being forced "to (1) submit an application for exemption, (2) file Form 1023, or (3) pay the 501(c)(3) application fee that is up to $850," which establishes their injury is concrete and particularized, and far from

conjectural or hypothetical. Doc. 22, Pl. Response in Opp. to Mot. to Dismiss, p. 4.

The Atheists contend that they have not applied for exemption as a religious organization or a church because it would violate their sincerely held belief to seek such a classification. Doc. 1, Complaint, ¶36. Plaintiffs also assert seeking classification as a religious organization or church would be futile, as attempts by other atheist groups to do so have been rejected by the IRS.

Defendant, on the other hand, argues that the Atheists voluntarily choose to spend their time and money complying with the alleged discriminatory standards for tax-exempt organizations and their self-inflicted injury fails to rise to an injury in fact and is not traceable to Government action. *See Clapper v. Amnesty Int'l USA,* 133 S.Ct. 1138, 1151-52 (2013).

Plaintiffs alternatively argue that they need not "twist in the bureaucratic wind" to remedy their alleged injury-in-fact because Establishment Clause and Equal Protection case law does not require them to establish an economic injury-in-fact to establish standing. Plaintiffs rely extensively on the recent decision, *Freedom From Religion Foundation, Inc. v. Lew*, No. 11-626, --- F. Supp. 2d ---, 2013 WL 6139723 (W.D. Wis. 2013), to support their position that they need not apply for "church" status and be denied in order to have suffered a concrete, particularized injury.

The Court concludes that Plaintiffs have failed to allege an injury-in-fact and their assertion that they would not qualify as a

church or religious organization is mere speculation. Initially, the Atheists' complaint concedes that some atheist organizations have obtained classification as a religious organization or church under §501(c)(3). *See* Doc. 1, Complaint, ¶22. The Atheists also admit Plaintiff "Atheist Archives of Kentucky's sincerely held beliefs would allow it to be classified as a 'religious organization' because atheist philosophy concerns solely religious beliefs." *Id.* at ¶41. Moreover, the IRS cites to a number of cases where state and federal law have recognized non-theist organizations as tax-exempt religious organizations. *See* Doc. 24, Def. Reply Brief in Support of Mot. to Dismiss, pp. 3-4 (citing *VIA v. C.I.R.*, T.C.M. 1994-349, 1994 WL 387144, at *5 (T.C.M. 1994) (nonprofit benefit organization designed to promote "wellness" of members qualified as religious organization); *Fellowship of Humanity v. Alameda County*, 153 Cal. App. 2d 673, 697-98 (Cal. Ct. App. 1957) (secular humanist organization is exempt from taxation under California law as a religious organization); *Strayhorn v. Ethical Society of Austin*, 110 S.W. 3d 458, 469-73 (Tex. App. 2003) (Ethical Society is a tax-exempt religious organization under Texas law)).

A review of case law establishes that the words "church," "religious organization," and "minister," do not necessarily require a theistic or deity-centered meaning. *See Torcaso v. Watkins*, 367 U.S. 488, 496 n. 11 (1961) ("Among *religions* in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism and

others.") (citation omitted and emphasis added); *McDaniel v. Paty*, 435 U.S. 618, 627 (1978) ("[M]inisterial status is defined in terms of conduct and activity rather than in terms of belief."); *Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005) ("[W]hen a person sincerely holds beliefs dealing with issues of 'ultimate concern' that for her occupy a 'place parallel to that filled by . . . God in traditionally religious persons' those beliefs represent her religion."); *Reed v. Great Lakes Cos.,* 330 F.3d 931, 934 (7th Cir. 2003) ("If we think of religion as taking a position on divinity, then atheism is indeed a form of religion.").

Moreover, "[s]everal district courts have applied, without explicitly adopting, a fourteen-criteria standard introduced in 1977 by Jerome Kurtz, then Commissioner of Internal Revenue, and thereafter applied by the IRS to evaluate whether an organization qualifies for church status pursuant to §170(b)(1)(A)(i)." *Found. of Human Understanding v. U.S.*, 88 Fed. Cl. 203, 219 (Fed. Cl. 2009), *aff'd*, 614 F.3d 1383 (Fed. Cir. 2010)(citations omitted). The fourteen criteria are: (1) a distinct legal existence; (2) a recognized creed and form of worship; (3) a definite and distinct ecclesiastical government; (4) a formal code of doctrine and discipline; (5) a distinct religious history; (6) a membership not associated with any church or denomination; (7) an organization of ordained ministers; (8) ordained ministers selected after completing prescribed studies; (9) a literature of its own; (10) established places of worship; (11) regular congregations; (12) regular religious services; (13) Sunday

schools for the religious instruction of the young; and (14) schools for the preparation of its ministers. *Id.* at 220 (citation omitted). An entity is not required to meet each of the criteria in order to obtain classification as a church for federal tax purposes. *Id.* at 219 (citation omitted).

Thus, the Atheists' assertion that they are subjected to unconstitutional discrimination and coercion due to their alleged inability to gain classification as religious organizations or churches under I.R.C. §501(c)(3) is mere speculation. At this point, the Atheists have no idea whether they could gain classification as a church or religious organization under I.R.C. §501(c)(3) because they have never sought such classification. Accordingly, the Atheists have not suffered a particularized injury which is fairly traceable to the actions of the Commissioner.

### 2. <u>Plaintiffs Must Establish Injury-In-Fact</u>

Plaintiffs' alternative assertion that relevant Establishment Clause and Equal Protection case law does not require them to establish an economic injury-in-fact in order to have proper Article III standing is unpersuasive. The case law cited by Plaintiffs in support of this argument, including the recently-decided *FFRF* case, is distinguishable. *See Freedom From Religion Foundation, Inc. v. Lew*, No. 11-626, --- F. Supp. 2d ---, 2013 WL 6139723 (W.D. Wis. 2013) (granting summary judgment for plaintiffs).

The *FFRF* Court held that the plaintiffs, who could not qualify as "ministers of the gospel," were not required to claim the I.R.C.

§107(2) exemption before challenging the statute and that the I.R.C. §107(2) tax exemption granted solely to "ministers of the gospel" violated the Establishment Clause. *Id.* at *8, 21-22. This decision is inapplicable to the instant case for several reasons. The *FFRF* lawsuit was filed by the tax-exempt organization Freedom from Religion Foundation ("FFRF") and its co-presidents, Laurie Gaylor and Dan Barker, challenging the constitutionality of I.R.C. §107. *Id.* at *1. The Court denied the defendant's motion to dismiss the plaintiffs' I.R.C. §107 claim. *Freedom From Religion Foundation, Inc. v. Werfel*, No. 12-946, 2013 WL 4501057 (W.D. Wis. 2013).

However, while the plaintiffs' complaint challenged both I.R.C. §107(1) and §107(2), the plaintiffs narrowed their claim to §107(2) at the summary judgment stage. 2013 WL 6139723, at *1. At that stage, the plaintiffs did not oppose the defendants' argument that plaintiffs lacked standing to challenge I.R.C. §107(1) and therefore, the Court granted the defendants' motion as to that aspect of their claim. *Id*.

As to the §107(2) challenge, the *FFRF* Court granted the plaintiffs' motion for summary judgment, because "ministers of the gospel" receive a tax-exempt housing allowance and Gaylor and Barker could not as they are not practicing clergy. *Id*. at *5.

In contrast, in this case, there are no named individual plaintiffs and no individuals who claim they could qualify for the minister of the gospel exemption under I.R.C. §107(1). Plaintiffs also do not allege they have any employees that receive a housing allowance, that they are suing on behalf of their employees who have

been injured by I.R.C. §107(2), or that Plaintiffs have a right to claim a tax-exemption under I.R.C. §107(2).

Additionally, unlike in *FFRF*, the Atheists' alleged injury is not "clear from the face of the statute" that plaintiffs are excluded from an exemption granted to others. *See* 2013 WL 4501057, at *2. In denying the defendant's motion to dismiss, the *FFRF* Court "concluded that plaintiffs' alleged injury is clear from the face of the statute and that there is no plausible argument that the individual plaintiffs could qualify for an exemption as 'ministers of the gospel,' so it would serve no legitimate purpose to require plaintiffs to claim the exemption and wait for the inevitable denial of the claim." 2013 WL 6139723, at *4. As noted above, Plaintiffs in this case *never* claim that their housing allowance was tax-exempt or that there are plaintiffs who could otherwise qualify for this tax exemption.

The *FFRF* decision is narrow and does not address standing to challenge any of the other statutes at issue in this case beyond 26 U.S.C. §107, including 26 U.S.C. §508 (application requirements for tax-exempt churches and religious organizations), 26 U.S.C. §6033 (annual return requirement), 26 U.S.C. §§1402, 3121, 3401 (employment tax exemptions, and 26 U.S.C. §7611 (examination authorizations).

Finally, the Plaintiffs in *FFRF* and the instant case present no facts or authority that establish that an organization expressing atheist beliefs could never qualify as a tax exempt religious organization or church. The *FFRF* Court based denial of Defendant's motion to dismiss on the fact that "the government admits that

plaintiffs could not qualify as 'churches' in order to receive the exemption." 2013 WL 4501057, at *3.

In contrast, Defendant here strongly argues that there is no evidence Plaintiffs could not qualify as a church or religious organization, and the IRS does not admit that the Atheists could not qualify as a "church" in order to receive the exemption. Defendant continually asserts that the Atheists could qualify as a church or religious organization under the challenged I.R.C. provisions.

This Court does not find the *FFRF* Court's finding that "there is no reasonable construction of §107 that would include atheists," persuasive or applicable to the instant case. 2013 WL 6139723, at *20. Rather, as Defendant points out, in the First Amendment context, atheism is considered a religion because "when a person sincerely holds beliefs dealing with issues of 'ultimate concern' that for her occupy a 'place parallel to that filled by . . . God in traditionally religious persons,' those beliefs represent her religion." *Kaufman v. McCaughtry,* 419 F.3d 678, 681-682 (7th Cir. 2005). This Court has no basis to presume that the IRS would not adopt the same or similar definition of religion and deny an atheist organization classification due to its alleged lack of supernatural beliefs.

The other authority on which Plaintiffs rely is similarly unpersuasive. Relying on *Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012), the Atheists argue that they "suffer injury from a form of 'personal and unwelcome contact' with the IRS classification system

that 'targets their beliefs for disfavored treatment.'" Doc. 22, Pl. Response in Opp. to Mot. to Dismiss, p. 7.

In *Awad*, the plaintiff challenged the constitutionality of a proposed constitutional amendment to the Oklahoma Constitution that forbade state courts in Oklahoma from considering or using Sharia law. 670 F.3d at 1116. The defendants moved for dismissal, arguing that the plaintiff lacked standing because the amendment had not yet taken effect, rendering the plaintiff's injuries speculative. *Id*. at 1120. After noting that "the concept of injury for standing purposes is particularly elusive in Establishment Clause cases," the Tenth Circuit held that the plaintiff's "allegation – that the proposed state amendment *expressly* condemns [the plaintiff's] religion and exposes him and other Muslims in Oklahoma to disfavored treatment – suffices to establish the kind of direct injury-in-fact necessary to create Establishment Clause standing." *Id*. at 1123. The Court further stated that, "[b]ecause the amendment would likely have been certified a week after it was passed, we further conclude that the injury alleged by [the plaintiff] is imminent and not conjectural or hypothetical." *Id*.

Additionally, citing to *Ne. Fla. Chapter, Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 667 (1993) and *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995), the Atheists assert that they need not participate in an unconstitutionally discriminatory scheme in order to demonstrate injury-in-fact under the Establishment Clause. However, in both those cases, the challenged

statutory scheme or regulation expressly favored certain racial or ethnic groups.

In *Ne. Fla. Chapter*, the plaintiff challenged an ordinance in Jacksonville, Florida which gave preferential treatment to certain minority-owned business in the award of city contracts. 508 U.S. at 658. The ordinance in question required 10% of the city contracts to be awarded to minority-owned businesses. *Id*. A minority was defined as "a person who is or considers himself to be black, Spanish-speaking, Oriental, Indian, Eskimo, Aleut, or handicapped." *Id*.

The District Court and Court of Appeals held that the plaintiff had no standing because "it failed to allege that one or more of its members would have been awarded a contract but for the challenged ordinance." *Id*. at 664. Reversing, the Supreme Court held that, "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id*. at 666.

Similarly, in *Adarand*, the plaintiff, a non-minority-controlled business, challenged a federal law which gave general contractors on Government projects a financial incentive to hire subcontractors controlled by "socially and economically disadvantaged individuals." 515 U.S. at 204. That federal law contained a presumption that "socially and economically disadvantaged individuals" included "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be

15

disadvantaged by the [Small Business] Administration pursuant to section 8(a) of the Small Business Act." *Id.* at 205. The Court found that plaintiff's injury was sufficient for standing since the "discriminatory classification prevent[s] the plaintiff from competing on equal footing." *Id.* at 211 (citing *Ne. Fla. Chapter*, 508 U.S. at 667).

Here, the statutes and regulations pertaining to tax-exempt organizations do not expressly favor certain churches or certain religious organizations, nor do they expressly favor theist organizations over atheist or non-theist organizations. In fact, the IRS argues that atheist and non-theist organizations may be eligible for treatment as religious organizations or churches under the I.R.C. Moreover, as addressed above, the labels "church," "religious organization," and "minister" do not create the same barriers seen in *Awad*, *Ne. Fla. Chapter*, or *Adarand*. As the Atheists have never sought classification as a church or a religious organization under I.R.C. §501(c)(3), their assertion that the IRS targets the Atheists' beliefs for disfavored treatment is unfounded.

Therefore, the Atheists have failed to establish a sufficient injury-in-fact to confer Article III standing.

### 3. No Representative Standing

The Atheists assert that even if they do not have standing themselves, they could still assert standing as a representative organization. This argument also fails. "[A]n organization has standing to sue on behalf of its members 'when (a) its members

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit.'" *Adland v. Russ*, 307 F.3d 471, 478 (6th Cir. 2002) (quoting *Hunt v. Wash. State Apple Adver. Comm.,* 432 U.S. 333, 343 (1977)).

Here, the parties dispute whether the Atheists can establish the first prong of the representative standing test. More specifically, the Commissioner argues that the Atheists cannot establish that their members suffered concrete or particularized harm. In response, the Atheists assert that, unlike donors to many churches and religious organizations, their members experience personal and unwanted contact with the IRS by having their information disclosed as donors.

The Atheists' representative standing argument suffers from the same problem outlined above – their asserted injury stems from their own voluntary actions in choosing not to seek classification as a church or religious organization. *See Clapper*, 133 S. Ct. at 1151-52. As such, the Atheists lack representative standing.

### 4. No Taxpayer Standing

The Atheists' argument that they have taxpayer standing to challenge the IRS's tax policies under *Flast v. Cohen*, 392 U.S. 83 (1968), is similarly flawed. In finding that taxpayer-plaintiffs had standing to challenge certain disbursements of funds to religious schools, the Supreme Court stated the following two-part test:

First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, [§] 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, [§] 8.

*Id.* at 102–03.

The Supreme Court has opined that "*Flast's* holding provides a 'narrow exception' to 'the general rule against taxpayer standing.'" *Arizona Christian Sch. Tuition Org. ("ACSTO") v. Winn*, 131 S. Ct. 1436, 1445 (2011) (quoting *Bowen v. Kendrick,* 487 U.S. 589, 618 (1988)).

Despite the Atheists' lengthy discussion of *Flast*, they fail to discuss the Supreme Court's recent holding in *ACSTO*. In fact, the following distinction made by the Supreme Court in *ACSTO* applies with equal force to the case at bar:

It is easy to see that tax credits and governmental expenditures can have similar economic consequences, at least for beneficiaries whose tax liability is sufficiently large to take full advantage of the credit. Yet tax credits and governmental expenditures do not both implicate individual taxpayers in sectarian activities. A dissenter whose tax dollars are "extracted and spent" knows that he has in some small measure been made to contribute to an establishment in violation of

conscience. In that instance the taxpayer's direct and particular connection with the establishment does not depend on economic speculation or political conjecture. The connection would exist even if the conscientious dissenter's tax liability were unaffected or reduced. When the government declines to impose a tax, by contrast, there is no such connection between dissenting taxpayer and alleged establishment. Any financial injury remains speculative. And awarding some citizens a tax credit allows other citizens to retain control over their own funds in accordance with their own consciences.

*Id.* at 1447 (internal citations removed).

Here, the Atheists have not challenged any specific expenditure made by the Government. Rather, the Atheists challenge specific provisions of the Internal Revenue Code, contending that they are unconstitutional because tax-exempt organizations are treated differently based upon a "particular organization's members' supernatural religious beliefs or lack thereof." Doc. 1, Complaint, ¶11. Thus, under the Supreme Court's holding in *ACSTO*, any financial injury that the Atheists allege as taxpayers resulting from the IRS's purportedly unconstitutional application of the §501(c)(3) tax exemptions is speculative.

Therefore, the Atheists lack standing as taxpayers.

## B. **Application of the Anti-Injunction Act and the Declaratory Judgment Act**

Although the above analysis demonstrates that the Plaintiffs lack standing to assert their claims, the Court will also briefly address the remaining arguments raised by the parties.

The IRS argues that based on the relief sought by the Atheists, a waiver of sovereign immunity has been expressly withdrawn by both tax

Anti-Injunction Act, 26 U.S.C. §7421(a), and the Declaratory Judgment Act, 28 U.S.C. §2201.

The Anti-Injunction Act states that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U.S.C. §7421(a). The Declaratory Judgment Act provides, "In a case of actual controversy within its jurisdiction, except with respect to Federal taxes . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. §2201.

Both parties agree that although the Anti-Injunction Act and the Declaratory Judgment Act are "not similarly worded[, they] are . . . to be interpreted coterminously." *Ecclesiastical Order of the ISM of AM, Inc. v. I.R.S.*, 725 F.2d 398, 404-05 (6th Cir. 1984) (Jones, J., concurring and dissenting in part); *see also Lugo v. Simon*, 453 F. Supp. 677, 690 (N.D. Ohio 1978) ("[T]he congressional intent [behind the Declaratory Judgment Act] was to create a prohibition as to actions concerning federal taxes coterminous with that provided in the Anti-Injunction Act so as to preclude circumvention of the provisions of the Anti-Injunction Act through the maintenance of an action seeking declaratory relief only.").

"The [Supreme] Court has interpreted the principal purpose of [the Anti-Injunction Act's] language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, and

to require that the legal right to the disputed sums be determined in a suit for refund." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974) (citation and internal quotations omitted).

Here, the Atheists request the Court to issue a judgment "[d]eclaring that all Tax Code provisions treating religious organizations and churches differently than other 501(c)(3) entities are unconstitutional violations of the Equal Protection of the Laws required pursuant to the Due Process Clause of the Fifth Amendment, the Religious Test Clause of Art. VI, § 3, and the Establishment Clause of the First Amendment of Constitution of the United States of America; [and e]njoining [the IRS] from continuing to allow preferential treatment of religious organizations and churches under § 501(c)(3)." Doc. 1, Complaint, pp. 12-13.

In *Hibbs v. Winn*, Arizona taxpayers sought to invalidate an Arizona tax credit that allegedly supported parochial schools in violation of the Establishment Clause. 542 U.S. 88, 92 (2004). There, the Supreme Court held that the Tax Injunction Act, which prohibits federal courts from restraining the assessment, levy, or collection of any tax under state law, did not bar the plaintiffs' suit because the relief sought by the plaintiffs – an injunction prohibiting allegedly unconstitutional tax credits – did not seek to interfere with the state's assessment or collection of taxes. *Id*. at 94.[3]

---

[3] While the IRS's argument here concerns the Anti-Injunction Act, the Tax Injunction Act is the state corollary to the Anti-Injunction Act. *See Hibbs*, 542 U.S. at 104 (2004) ("Just as the [Anti-Injunction Act]

Pursuant to the Supreme Court's holding in *Hibbs*, the Atheists' requested relief – an injunction prohibiting allegedly unconstitutional tax credits – does not run afoul of the Anti-Injunction Act, 26 U.S.C. §7421(a), or the Declaratory Judgment Act, 28 U.S.C. §2201, because the requested relief does not seek to curb the IRS's ability to assess or collect taxes.

Accordingly, the Atheists' claim is not barred by the Anti-Injunction Act or the Declaratory Judgment Act.

## C. **Failure to State a Claim**

Rule 8(a) requires a plaintiff to "allege facts that, if accepted as true, are sufficient 'to raise a right to relief above the speculative level,' and to 'state a claim to relief that is plausible on its face.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### 1. **Equal Protection Clause**

The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state an equal protection claim, a plaintiff must adequately plead that the

---

shields federal tax collections from federal-court injunctions, so the [Tax Injunction Act] shields state tax collections from federal-court restraints."); *McCrory Corp. v. State*, 212 B.R. 229, 232 (S.D.N.Y. 1997) (stating that the Tax-Injunction Act and the Anti-Injunction Act "should be interpreted in a harmonious manner").

government treated the plaintiff "disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.,* 470 F.3d 286, 299 (6th Cir. 2006). As we have held, the "threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough v. Morgan Cnty. Bd. of Educ.,* 470 F.3d 250, 260 (6th Cir. 2006).

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).[4]

Rather than discuss the "threshold element of an equal protection claim," the Atheists assert that they are members of a suspect class and, thus, the exemptions provided to churches and religious organizations under the challenged provisions of the I.R.C. are subject to strict scrutiny. See *id.* Since the Atheists cannot show that they have suffered any disparate treatment as a result of the IRS's application of the above-referenced provisions of the I.R.C., the Court need not determine the type of scrutiny that would need to be applied in an Equal Protection analysis.

Regarding the issue of disparate treatment, the Atheists concede that they "concern themselves with religion," yet postulate that "it is not plausible or rational to assert that the IRS might ever deem any [] purely anti-theistic entities to qualify as churches or religious organizations within the meaning of I.R.C. § 501(c)(3)."

---

[4] "We evaluate equal protection claims against the federal government under the Fifth Amendment just as we would evaluate equal protection claims against state and local governments under the Fourteenth Amendment." *Ctr. for Bio-Ethical Reform, Inc.*, 648 F.3d at 379.

Doc. 22, Pl. Response in Opp. to Mot. to Dismiss, p. 18. This assertion is pure speculation. The Atheists concede that some atheist organizations have obtained classification as a religious organization or church under §501(c)(3). *See* Doc. 1, Complaint, ¶¶21-22. Additionally, the Atheists point to no statute or regulation which forecloses an atheist organization from classification as a church or religious organization. Accordingly, the Atheists' assertions of disparate treatment are conclusory and are not entitled to a presumption of truth at this stage of the litigation. *See Ctr. for Bio-Ethical Reform, Inc.*, 648 F.3d at 379.

Though the Atheists' argument under the Equal Protection clause is not entirely clear, either way it is presented, the Atheists cannot establish an Equal Protection claim. If the Atheists are arguing that they are a church or a religious organization and the IRS has discriminatorily applied the above-referenced provisions of the I.R.C., then the Atheists' assertion is pure speculation because they have not actually sought classification as a church or a religious organization. If, on the other hand, the Atheists are arguing that they are not a church or a religious organization and the IRS is discriminating by only applying the challenged I.R.C. provisions to churches or religious organizations, then the Atheists have not stated a claim under the Equal Protection clause. More specifically, the Atheists cannot establish that they have been treated disparately as compared to similarly-situated organizations.

Accordingly, the Atheists have failed to state an Equal Protection claim.

## 2. No Religious Test Clause

In their second claim, the Atheists assert that the Commissioner violates the No Religious Test Clause, Art. VI, cl. 3, through the exemptions provided to churches and religious organizations under certain provisions of the I.R.C.  Doc. 1, Complaint, ¶¶56-59.

Article VI, clause 3 of the United States Constitution states:

> The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

Interestingly, the Atheists argue that "modern-day 501(c)(3) entities amount to public Trusts," and, "[t]hus, I.R.C. § 501(c)(3)'s favorable treatment of certain 501(c)(3) entities based solely on their religious faithfulness, over non-theistic organizations, violates the No Religious Test Clause."  Doc. 22, Pl. Response in Opp. to Mot. to Dismiss, p. 25.

"The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *D.C. v. Heller*, 554 U.S. 570, 577 (2008) (quoting *United States v. Sprague,* 282 U.S. 716, 731 (1931)) (further citation omitted).  "Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical

meanings that would not have been known to ordinary citizens in the founding generation." *Id*. at 577-78.

Reading Article VI, Cl. 3 as a whole, rather than deconstructing each of its words and phrases, would not lend itself to the extension of the phrase "public Trust" requested by the Atheists.

Similarly, the limited case law discussing the No Religious Test Clause does not support the Atheists' argument. *See Torcaso v. Watkins*, 367 U.S. 488, 491 (1961) ("When our Constitution was adopted, the desire to put the people securely beyond the reach of religious test oaths brought about the inclusion in Article VI of that document of a provision that no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.") (internal quotations omitted); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 903 (1995) ("Both the context and the plain language of the [No Religious Test] Clause show that it bars the States as well as the Federal Government from imposing religious disqualifications on federal offices.") (Thomas, J., dissenting); *Stewart v. Washington*, 301 F. Supp. 610, 611 (D.D.C 1969) (stating that the No Religious Test Clause "recoil[s] from the odious test oaths that emerged in Britain in the 17th century, and which disqualified from public office all Catholics and non-conformists not subscribing to the doctrines of the Church of England"); *Smith v. Lindstrom*, 699 F. Supp. 549, 561 (W.D. Va. 1988), *aff'd sub nom.*, *Smith v. Cnty. of Albemarle, Va.*, 895 F.2d 953 (4th Cir. 1990) ("Surely, the object of [Article VI, Cl. 3 of the

United States Constitution] is to keep participation in the political community from being narrowed on the basis of religious adherence.")

The Atheists go to great lengths in their briefs to convince the Court that tax-exempt organizations under I.R.C. §501(c)(3) should be considered "public Trusts" because the purpose of providing organizations exemptions under §501(c)(3) is to serve a public interest – namely, alleviating the cost of providing government services. Doc. 22, Pl. Response in Opp. to Mot. to Dismiss, pp. 25-34. However, a basic reading of Art.VI, Cl. 3 and the limited case law discussing that provision does not suggest that the this clause stretches to the lengths suggested by the Atheists.

Accordingly, the Atheists have failed to state a claim under the No Religious Test Clause.

### 3. **Establishment Clause**

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const., amend. I; *Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947). In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court set out a three-part test for determining whether government conduct violates the Establishment Clause. *Am. Civil Liberties Union of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 430 (6th Cir. 2011), *cert. denied,* 132 S. Ct. 368 (2011). "The test 'ask[s] (1) [whether] the challenged government action has a secular purpose; (2) [whether] the action's primary effect neither advances nor inhibits religion; and (3)

[whether] the action fosters an excessive entanglement with religion.'" *Id*. at 430-31 (quoting *Lemon*, 403 U.S. at 612-13).

While the Sixth Circuit in *DeWeese* acknowledged that both the Sixth Circuit and the Supreme Court have questioned the utility of the *Lemon* test, the Sixth Circuit nonetheless stated that, "*Lemon* remains the law governing Establishment Clause cases." *Id*. at 431 (citation omitted).

The Atheists assert that pursuant to *Texas Monthly, Inc. v. Bullock*, which the *FFRF* Court found to be controlling, it has sufficiently alleged that the tax provisions at issue improperly advance religion.

In *Texas Monthly v. Bullock*, 489 U.S. 1, 14 (1989), a plurality opinion, the Supreme Court held that, "Texas' sales tax exemption for periodicals published or distributed by a religious faith and consisting wholly of writings promulgating the teaching of the faith lacks sufficient breadth to pass scrutiny under the Establishment Clause." The Court further stated that "when government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion, as Texas has done [], it provide[s] unjustifiable awards of assistance to religious organizations and cannot but conve[y] a message of endorsement to slighted members of the community." *Id*. at 15 (internal citation and quotations omitted).

The IRS asserts that the challenged provisions of the I.R.C. are, in fact, required by the Free Exercise Clause. More specifically, the IRS argues that the I.R.C. provisions at issue have "the secular purpose of alleviating governmental interference with the ability of churches and certain religious organizations to define and carry out their religious missions." Doc. 19-1, Def. Memo. in Support of Mot. to Dismiss, pp. 26-27. In response, the Atheists assert that the "IRS does not point to any specific facts or legislative intent showing that the provisions at issue in this case are necessary to avoid a Free Exercise violation against religious organizations." Doc. 22, Pl. Response in Opp. to Mot. to Dismiss, p. 36.

While both parties argue the merits of the Atheists' Establishment Clause claim, their arguments are unnecessary at this stage because the Atheists have sufficiently pleaded that the I.R.C. provisions at issue do not have a secular purpose and they improperly endorse religion. Nonetheless, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (citation omitted). Thus, the fact that the Atheists have properly stated a claim under the Establishment Clause does not obviate the Article III standing requirements.

Therefore, the Court being advised,

**IT IS ORDERED THAT:**

1. Pursuant to the foregoing analysis, the Defendant's motion to dismiss (Doc. 19) be, and hereby is, **GRANTED**; and

2. A separate judgment will enter concurrently herewith.

This 19th day of May, 2014.



Signed By:

_**William O. Bertelsman**_ WOB

**United States District Judge**